JAMES G. BROWN

v.

FREDERICK W. KRAUSE et al.

*Filed at Ottawa March 29, 1890.*

|132  177|
|59a 327|

1. ESTOPPEL—*purchase by beneficiary under trust deed—estoppel to deny the bona fides of the sale.* The holder of notes secured by deed of trust exercised his option of declaring the whole debt due for a default in paying a part when due, and caused the trustee to sell the mortgaged property, and became the purchaser at less than one-half the price for which he had before sold it to the debtor. It was *held,* that such purchaser was thereby estopped from denying that the trustee's sale was a *bona fide* one, and was held to have instructed his agent what bid to make, and that his action afforded evidence against him that he did not regard the property as worth any more than his bid.

2. RESCISSION OF CONTRACT—*for fraud.* In this case, the facts and circumstances attending the sale of certain real estate are given in detail, showing such fraudulent misrepresentations on the part of the vendor as to call for a rescission of the contract at the instance of the purchaser.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. EGBERT JAMIESON, Judge, presiding.

This is a bill filed in the Superior Court of Cook County on July 20, 1886, by James G. Brown of St. Louis, Missouri, to foreclose a deed of trust, dated March 14, 1884, executed by Frederick W. Krause and Josephine M. Krause, his wife, to Thomas E. Ralston of St. Louis, Missouri, as trustee, to secure five notes, dated April 1, 1884, made by Frederick W. Krause to the order of James G. Brown, drawing six per cent interest, amounting all together to $65,000.00, one for $5000.00 due one year after date, three for $8000 each, due in 2, 3 and 4 years after date respectively; and one for $36,000.00, due in five years after date, and to further secure the performance of a contract hereinafter mentioned and the payment of certain

12—132 ILL.

advances hereinafter referred to, said trust deed conveying
certain property in the city of Chicago at the southeast corner
of Washington and Jefferson streets, with the buildings, ma-
chinery and improvements thereon, subject to an incumbrance
of $14,000.00 owned by the Provident Life and Trust Com-
pany, one of the appellees herein, which, as it is recited in the
trust-deed, neither Ralston nor Brown assumes to pay.

James G. Brown was a member of the firm of Dodd, Brown
& Co. of St. Louis. The notes secured by the trust deed rep-
resent the purchase price of a sugar plantation, known as the
China Grove plantation in Brazoria County, Texas, containing
1628 acres, which Brown agreed to sell to Frederick W. Krause
of Chicago, putting the price at $65,000.00. Krause and wife,
at the same time when they executed the trust deed on the
Chicago property, also executed another trust deed to the same
trustee upon the Texas plantation to secure the same notes.
The plantation was owned by Dodd, Brown & Co., though the
title stood in Brown. A warranty deed, dated as of the same
day on which the two trust deeds were dated, towit : March 14,
1884, was executed by Brown, not to Josephine M. Krause,
but to her husband, Frederick W. Krause. The consideration
recited in this deed was $65,000.00, but, by an express pro-
vision contained therein, Brown only warrants the title to the
extent of $36,000.00.

When the trust deeds were made the Chicago property be-
longed to Mrs. Krause; it was her separate property. She
died intestate a few months after making the trust deed. Her
seven children were made defendants to the original bill, and
are among the appellees herein, two of them being adults and
five being minors. A guardian ad litem was appointed for
the minors and filed the usual formal answer.

The two trust deeds upon the Chicago lots and the Texas
plantation, though dated March 14, 1884, were not acknowl-
edged or finally executed until March 24, 1884. The trust
deed on the Chicago lots was recorded at once on March 24,

1884; that on the plantation was recorded in Texas on April 16, 1884.

The trust deeds contained provisions, that, in case of default in payment of the notes, etc., Krause was, within 20 days after written demand made upon him, to convey to Brown the Chicago property and the Texas plantation. The bill avers that Krause had made default in the payment of the note first due and of the advances made to him to run the plantation, etc., and that the Texas plantation had been sold for $30,000.00 under the trust deed thereon after failure to comply with the written demand for a deed, and that the amount of such sale less expenses had been credited upon the notes. The bill also avers that $5846.71 is due for advances and $35,820.00 upon the notes.

The joint and several answer of Frederick W. Krause and of his two adult children Frederick F. Krause and Josephine S. Krause, admits the execution of the trust deeds, etc., but charges that they were obtained by fraud and fraudulent representations as to the value, condition and capacity of the Texas plantation, etc.

Krause and his seven children also filed a cross-bill against Brown setting up the fraud and misrepresentation as charged in the answer, and also that there was a rescission of the contract in the winter of 1884-5 and praying that the trust deed on the Chicago property be declared null and void and that the notes be cancelled, etc. Brown answered the cross-bill denying its allegations.

On July 13, 1888, the Court below rendered a decree, dismissing the original bill and granting the relief prayed by the cross-bill. This decree was affirmed by the Appellate Court.

Messrs. WISE & DAVIS, and Mr. FREDERIC ULLMANN, for the appellant:

The burden of proof is on complainant in the cross-bill to prove false and fraudulent representations, or that the con-

tract was rescinded. And to justify a court in rescinding a contract on the ground of fraud practiced by one, the evidence must be clear. *Walker* v. *Hough*, 59 Ill. 375; *Tuck* v. *Downing*, 76 id. 70; *Mix* v. *White*, 36 id. 484; *Dillman* v. *Nadlehoffer*, 119 id. 577.

When a party to whom representations are made, resorts to the proper means of verification, so as to show he had in fact relied on his own inquiries, he will not be permitted to avoid the contract on the ground of false representations. Adams' Eq. Jur. (7th ed.) 177; *Fauntleroy* v. *Wilcox*, 80 Ill. 477; *Schramm* v. *O'Connor*, 98 id. 539; *Bond* v. *Ramsey*, 89 id. 29; *Walker* v. *Carrington*, 74 id. 446.

A party must repudiate the contract on discovery of fraud, (1 Story's Eq. Jur. sec. 203 a, *Hall* v. *Fullerton*, 69 Ill. 448, *Bond* v. *Ramsey*, 89 id. 29,) and commence legal proceedings within a reasonable time. *Cox* v. *Montgomery*, 36 Ill. 396; *Rogers* v. *Higgins*, 57 id. 244; *Warren* v. *Walbridge*, 61 id. 174; *Elder* v. *Sabin*, 66 id. 126; *Lockridge* v. *Foster*, 4 Scam. 569; *Cunningham* v. *Fithian*, 2 Gilm. 650; *Wilbur* v. *Flood*, 16 Mich. 40; 2 Denio, 136; 7 Blackf. 501.

When land has been conveyed, there must be a tender of a deed of re-conveyance. Bigelow on the Law of Fraud, p. 421, chap. 2, sec. 8; *Jeffers* v. *Forbs*, 28 Kan. 174; *Wilbur* v. *Flood*, 16 Mich. 40; *Dowden* v. *Wilson*, 108 Ill. 257.

To rescind for fraud, parties must be placed *in statu quo*. *Smith* v. *Brittenham*, 109 Ill. 540; *Strong* v. *Lord*, 107 id. 25; *Cable* v. *Ellis*, 86 id. 536; *Dowden* v. *Wilson*, 108 id. 257.

To prove a rescission or abandonment of a contract, the evidence must be reasonably clear and definite, and at least satisfy the mind that such was the intention of the parties. *Mix* v. *White*, 36 Ill. 486; *Flemming* v. *Duncan*, Sneed, 385; *Huffman* v. *Hummier*, 18 N. J. Eq. 83; *Baldwin* v. *Salter*, 8 Paige, 473; *Stoutenbrough* v. *Tompkins*, 1 Stockt. 332; *Harrison* v. *Polar Star Lodge*, 116 Ill. 287.

Mr. JOHN N. JEWETT, and Messrs. JEWETT BROS., for the appellees:

The representations made by James G. Brown, the appellant, were of material facts connected with the plantation he wished to sell, and were the inducements by means of which the sale was made, and being false, whether known by him to be so or not, they amount, in equity, to a fraud, and the contract of purchase will for that reason be rescinded. *Lockridge* v. *Foster*, 4 Scam. 569; *Case* v. *Ayers*, 65 Ill. 142; *Allen* v. *Hart*, 72 id. 104; *Ladd* v. *Pigott*, 114 id. 647.

When a sale is made of property not present, at a remote distance, which the seller knows the buyer has not seen, then the representations, when relied on, amount to a warranty. *Smith* v. *Richards*, 13 Pet. 26; 12 Me. 262; 6 Wis. 295; *Hicks* v. *Stevens*, 121 Ill. 186.

The purchaser has the right to rely on the statements of the vendor. *Mead* v. *Bunn*, 32 N. Y. 275; *McClellan* v. *Scott*, 24 Wis. 81; *Converse* v. *Blumrich*, 14 Mich. 108.

A party guilty of fraudulent conduct should not be allowed to cry "negligence" as against his own deliberate fraud. *Linington* v. *Strong*, 107 Ill. 295; *Hale* v. *Philbrick*, 42 Iowa, 81; *Matlock* v. *Tod*, 19 Ind. 130; *Starkweather* v. *Benjamin*, 32 Mich. 305.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

The main witnesses in behalf of the complainants in the cross-bill as to the representations, which were made by Dodd, Brown & Co. to induce Krause and his wife to purchase the Texas plantation, were Krause himself and his oldest son. Their testimony is confirmed by so many circumstances, and is so consistent with the conduct of the parties and with the character and outcome of all their proceedings, that it commends itself to our minds as worthy of belief. The main witnesses to show, that the representations in question were not made, were Dodd and Brown. We cannot accept their

statements as presenting a true account of what occurred. Their memories are accurate as to everything, which makes for their own interest, and sadly at fault as to all matters tending in the opposite direction. That the plantation was not what it was represented to be is shown by abundance of testimony outside of any statements made by the parties in interest.

Frederick W. Krause was a practical machinist, carrying on his trade as such upon the property owned by his wife at the corner of Washington and Jefferson Streets in Chicago. His wife also owned two houses on Congress Street in that city, one of which they occupied as a homestead. He was a simple-minded, confiding man, practical enough when engaged in his own chosen business, but upon all other subjects inclined to be somewhat of a theorist. Dodd and Brown were merchants of large experience, who had carried on business for many years in St. Louis and New York City, and had engaged in extended business operations in different parts of the country. They were shrewd men of the world, accustomed to dealing with men and to making sharp bargains.

· Krause's family, besides his wife, consisted of eight children. He and his wife were both anxious to get out of the city and to live in a milder climate. He had no money, but wanted to · exchange the Chicago property for a place in the South. The property at the corner of Washington and Jefferson Streets was worth $44,000.00. It was subject to a mortgage of $14,000.00, and Mrs. Krause's equity was admitted to be worth $30,000.00 by express stipulation with Brown as embodied in the contracts and trust deeds. Krause considered the houses worth $8000.00.

He first heard of China Grove plantation and of Dodd, Brown & Co. as the owners of it, in the summer of 1883 from a speculator by the name of Johnson. In June or July a member of the firm of Dodd, Brown & Co. named Daughaday called upon him in reference to the place and looked at the Chicago

property. About the first of August, 1883, Krause, having occasion to go to Texas to look at some land that had been offered him near Columbia, passed through St. Louis, obtained from some one in Dodd, Brown & Co.'s store a sealed letter of introduction to the manager of China Grove plantation, which lay on the line of his journey to Columbia, and stopped over at the plantation and looked at it. The extent of his examination will be commented upon hereafter. He made up his mind that the place was not what he wanted, and that he did not have the means to handle it. Accordingly he did not call upon Dodd, Brown & Co. when he passed through St. Louis on his way back, as they had requested him to do.

A few weeks after his return to Chicago and in September, 1883, Dodd came to see him. Two weeks after this Dodd, Brown & Co. sent their confidential agent, H. L. Page, to see him. Page persuaded him to go to St. Louis and he went there about the middle of October, 1883, and saw both Dodd and Brown. They there induced him to enter into an option contract for the purchase of the plantation at $60,000.00. This contract bore date October 17, 1883, and was afterwards abandoned and destroyed. No copy of it appears in the record.

Mrs. Krause objected to the contract made by her husband, and Krause so wrote to Page on October 22, 1883. Dodd answered quieting Krause's fears and regrets, and stated that Brown would be in Chicago in a few days. Brown came to Chicago once or twice after this and during the fall of 1883. In the latter part of November or early in December Brown went to Krause's house, and spent an evening talking with Mrs. Krause and her children and praising the China Grove plantation. Early in December Dodd went to China Grove and made a contract with Vincent, the manager of Dodd, Brown & Co., to remain in the charge and management of the place during the year 1884.

In December Dodd, Brown & Co., by letter or telegram, again induced Krause to come to St. Louis, offering to pay

half the expenses of the trip. He went down between Christmas and New Year's day, and was then told, among other things, that an English Syndicate was intending to buy up the surrounding lands and settle them with parties from England, and that a new town was to be laid out on the railroad in the near neighborhood. The evidence and the correspondence show, that Dodd, Brown & Co. were pressing Krause during this time to sell the two houses on Congress Street. He sold them in January, 1884, for $6100.00, and so wrote to Dodd, Brown & Co. Page came up about March 14, 1884, and obtained from Krause a memorandum of agreement for the purchase of the place at $65,000.00, and returned at once with it to St. Louis. There Dodd, Brown & Co. prepared a new contract, the trust deeds upon the Chicago property and the Texas plantation, and the deed to Krause of the plantation, all dated March 14, 1884. With these papers Page returned to Chicago on March 23, 1884. On the next day Krause alone signed the contract, he and his wife signed the trust deeds, and he paid to Page $4000.00 of the $6100.00 realized from the sale of the houses. Page returned to St. Louis, having obtained the money and the executed papers.

All the contracts and deeds, which were executed by Krause, were drawn by the attorneys of Dodd, Brown & Co. under their direction in Saint Louis. Krause had no legal adviser. We cannot resist the conclusion, that Krause was deceived and overreached in the execution of these papers. They are entirely one-sided. Their terms and provisions favor Brown and are most unfavorable to the other party.

In the early part of April, 1884, Krause went to China Grove. In the latter part of the same month his family followed him. He and the surviving members of the family remained there until May, 1885, and then returned to Chicago. To him the results of this transaction were disastrous in the extreme.

He executed notes to the amount of $65,000.00 and trust deeds upon the Chicago and Texas property to secure the same : Dodd, Brown & Co. took the notes and trust deeds. His wife's houses were sold for $6100.00 : Dodd, Brown & Co. took $4000.00 of this amount as soon as the papers were executed, and they have never returned any of it. About $1700.00 of the balance was expended for houses and other improvements upon the Texas plantation, which finally went back into the hands of Dodd, Brown & Co. Krause and his son took machinery to the Texas place worth $10,000.00 and erected a saw mill thereon : Dodd, Brown & Co. possessed themselves of the saw-mill and machinery. Their superintendent, Vincent, remained in the management of the place until January 1, 1885, notwithstanding the presence there of Krause and his family and the nominal ownership of the latter. A crop, consisting of 208 hogsheads of sugar and over 350 barrels of syrup, was raised upon the place in 1884, and was all shipped in January, 1885, to Dodd, Brown & Co. at St. Louis. The labors and money of Krause and his son contributed to the production of that crop, but they never received one dollar of the proceeds of the sale of it : all the proceeds went into the pockets of Dodd, Brown & Co. A few days after the first note became due on April 1, 1885, Dodd, Brown & Co. declared the whole indebtedness of $65,000.00 due, figured out an additional indebtedness against Krause of $5846.71 for advances made to him, and sold out and bought in the Texas plantation under the trust deed in July, 1885, and have filed the present foreclosure bill against the property in Chicago alleging an unpaid balance of $41,666.71. On June 30, 1884, about two months after she arrived at the plantation Mrs. Krause died ; on July 4, 1884, one of her daughters died. On account of the sickness of the younger children Krause was obliged to take them to Galveston early in July where he remained nursing them for a month or more ; they were there as late as October 19, 1884, nursed and cared for by an older sister.

In order to induce Krause to buy the plantation Dodd, Brown & Co. misrepresented its *value.* The price named in the contract of March 14, 1884, and in the trust deeds is $65,000.00. Krause swears that Daughaday told him they wanted $75,000.00 for the place and that Dodd told him its value was $65,000.00. The price named in the first contract of October 17, 1883, was $60,000.00. That Dodd, Brown & Co. had insisted upon this price appears from a letter written by Dodd to Krause on December 17, 1883, in which Dodd tells K. that, if he can sell his Chicago property for enough to make a liberal cash payment, "we should be tempted to make some concessions as to price."

Brown, when asked why he limited his warranty in the deed to $36,000.00 only of the purchase price, says that "$36,000.00 was the value of the land," and that he did not warrant the improvements and the mules or cattle, because the former might be burned and the latter might die, thus placing the value of everything else on the place, except the land itself, at $29,000.00. He also says that in March, 1884, the price was raised to $65,000.00 from the $60,000.00 agreed on in October "on account of the advances made during the months of December, (1883,) January and February," (1884). Page says, that the price was increased to $65,000.00 because "there had been about 75 or 100 acres of cane planted."

It is to be noted that no mention is made, either in the contract or trust deeds, of the $4000.00 paid to Page on March 24, 1884; this sum added to the $65,000.00 makes the amount charged for the plantation $69,000.00, unless there was such a partnership arrangement as is hereafter referred to.

Now, what is the proof as to the actual value of this plantation, consisting of 1628 acres, when it was sold to Krause in March, 1884? Unimproved land in the immediate vicinity could be bought for 87½ cents per acre. Dodd, Brown & Co. themselves had bought land about that time at 87½ cents per acre adjoining or very near China Grove. The plantation

with all the improvements upon it was not worth more than from $5.00 to $7.00 per acre. Better land could be bought in the neighborhood in an improved condition at $5.00 per acre. This is the testimony of parties living at China Grove station, and who had known the land for years, and some of whom had lived upon it. One Louis Warner testifies, that the original China Grove plantation, containing 4400 acres and including the 1628 acres in question, was offered for sale for $20,000.00 by an agent of Dodd, Brown & Co. in 1882. Warner had been in the sugar business for 35 years, and had lived at China Grove Station since 1871, and had been manager of this very plantation.

Dodd, Brown & Co. had owned the place certainly since 1876. They failed in 1878. C. E. Phillips, who says he had charge of their business in Texas from 1876 or 1877 to 1882, swears that he was offered $20,000.00 for China Grove plantation by one Ellis in 1879, and submitted the offer to Dodd, Brown & Co. or their assignee at St. Louis, and that the offer was accepted, but the purchaser declined to carry out the trade. This offer included the 4400 acres above mentioned and all the improvements, wagons, cattle, mules, oxen, farming implements, sugar house and machinery then upon the 1628 acres. There is testimony going to show that the property had depreciated in value since 1879. Dodd, Brown & Co. had used the place as a sort of trading asset for years. They took it for debt in 1876 from an embarrassed debtor, who had occupied the same office with Brown in New York City for a number of years. When they failed in 1878, their creditors seem to have valued it at a very low figure, but Dodd is unable to remember what that valuation was. It passed to their assignee apparently in 1878, but afterwards back to them. Brown, testifying on January 11, 1887, says that he had sold the plantation early in November, 1886, to one Claflin, but Juliffe testifying in June, 1887, says that he was then managing the place for Dodd, Brown & Co.

The plantation was sold on July 30, 1885, under the trust deed given by Krause to Ralston, and bought by Brown for $30,000.00. The sale was made by Page, the employee of Dodd, Brown & Co., who had been substituted as trustee in the place of Ralston, and the place was bid in for Brown by his agent, one Sheppard. It might be said that this was only a nominal sale, made by Brown acting through one agent to Brown acting through another agent. It might also be said, that the property was struck off for only $30,000.00, in order that as large an indebtedness as possible might be left to be made out of the Chicago property. But Brown is estopped from denying that the trustee's sale was a bona fide sale, and he must be held to have instructed Sheppard what bid to make. This sale shows that he did not regard the plantation as worth more than $30,000.00 in July, 1885. At that time it had upon it the additional buildings, improvements, machinery and mules which Krause had placed there, together with all the repairs he had made upon the old buildings and machinery. At that time also the crop for the next year was in the ground.

It appears from the testimony of Page that he went to the plantation in June, 1884, and, in the accounting had at that time, Krause was charged with some $4500.00 or $5000.00 for advances made from January 1, 1884, to July 1, 1884, the heaviest expenses being between January and March. And yet Krause had already been made to pay the advances made in January and February by the increase of the purchase price from $60,000.00 to $65,000.00.

Dodd, Brown & Co. misrepresented to Krause and his wife the *condition* of the plantation, and its character as to *healthiness*. Page, a witness for appellant, swears that Dodd told Krause in September, 1883, that the plantation was a very nice one, and had been and then was in good running order. Krause was approaching the age of sixty and was failing, and wanted to go to a mild and healthy climate, where his own health would be better, and where his children could expand

and combine manufacturing and mechanical with agricultural work. He so told both Dodd and Brown. They told him, that China Grove was healthy and well drained and reached by the breezes from the gulf; that the sugar house was the best in Texas, with good machinery which they had put in themselves; that the plantation was in a high state of culti-vation; that the mules and oxen were in good condition, the former having been shipped from St. Louis; that the fences and buildings were in good shape; that the farming imple-ments, necessary to do the work, were there on the place; that certain English families were about to settle there, and a mile of the land lying on the railroad could be laid out into lots. They also represented, that there was fine timber on the place, and that it would be just the thing to take down machinery and start a saw-mill; that what appeared to be a swamp was only a lake.

There is one significant fact in the case, which is proven beyond question, and that is, that Mrs. Krause was opposed to the purchase as agreed upon on October 17, 1883, and that, in consequence of her objections, Brown went to see her and spent several hours talking to her, and that thereafter her opposition ceased. He made to her the same representations which had been made to her husband, and stated that the dwelling house was a nice one, that the family would be bet-tered by going there, and that they "would find it there very agreeable all the year round." She seemed to hesitate about making the purchase and suggested that her husband and son should go down and make an examination. Brown said this would be a useless expense, and that a house of such standing as the house of Dodd, Brown & Co. would not make misrep-resentations. She asked him if it was possible that a man in his position could desire to take what little she and her hus-band possessed, and he answered that he did not wish "to take any advantage of us," or "to swindle us out of what we had." Upon being told that Krause had no experience in operating

a sugar place, he stated that Mr. Vincent was an experienced and excellent man who "would run it properly."

What were the actual facts? During a part of the mild season at China Grove there were severe droughts and during another part heavy rains. The drainage was poor. The ditches did not carry off the water. The land was low and there were many depressions in it. Sometimes a portion of the place would have a depth of eighteen inches of water on it. The water would evaporate and malaria resulted. The water used for drinking was rain water. The cistern was poor and filthy. The plantation was unhealthy. This is admitted by Vincent, who speaks of his own sickness in the Summer of 1883. It is further evidenced by the deaths of Mrs. Krause and her daughter and an old grandfather who went down with them, and by the continued sickness and necessary removal to Galveston of the Krause children. The dwelling house was leaky and rotten. It was built on posts; the doors and windows were shackly, and the sills were decayed. There were four rooms in it. Vincent was occupying it when Krause and his family arrived. Two of the Krause boys and the grandfather were obliged to sleep in an out house in the door-yard. Krause went to work to build a house for Vincent, the manager of Dodd, Brown & Co., to live in, spending thereon at least $690.00 of his own money. The other buildings—the stable, the negro cabins, the blacksmith shop, etc.,—were old and dilapidated. The roof of the sugar house leaked. The machinery, which had been in use for many years, was second hand machinery when it was brought there, and was in constant need of repair. The wagons and farming implements were old and worn out. Many of the mules and oxen were unfit for service. The place had been worked by convicts the year before. The good timber had all been cut off and used for fire-wood in running the sugar house. Besides a house for Vincent, Krause built a store-house and a cabin. He bought some fourteen mules because Vincent claimed they

were necessary. Vincent kept the pay-rolls, and Krause in one of his letters complains of being unable to see them. Vincent does not pretend to have turned the place over to Krause until some time in June, and, even after that, he managed the place, while Krause and his son looked after the machinery in the sugar-house. The plantation was, in all respects, the opposite of what it was represented to be.

But the main representation made by Dodd, Brown & Co. was as to the amount of money that could be made in the operation of the plantation. They told Krause that the crop of 1884 ought to yield him a profit of $20,000.00. They proposed to form a sort of partnership with him in running the place. He made up his mind in October, 1883, that he had not means enough to operate the plantation, and he and his wife intended to give up the idea of buying it. But Dodd and Brown proposed to advance the money to raise the crop and bring it to market. They assured Krause that, with the means advanced by them, he could pay the notes and return the advances. They led him to believe that it would be a joint enterprise in which they would both be interested, and that he could pay for the plantation out of what could be made out of it. This appears from the testimony of the witnesses, from the correspondence and from the language of the contract and trust deeds.

They continued to urge him to sell the houses in Chicago, in order to raise money for the joint operation of the place. When he did make the sale, they took the $4000.00, reciting in the receipt given for it, that it was "to be applied on advances as specified in contract dated March 14, 1884, with James G. Brown." The advances specified in the contract were advances which Dodd, Brown & Co. were to make to secure the growing crop, and which were to be repaid to them out of "the first proceeds of said crop." They not only made Krause contribute $4000.00 towards the advances which they themselves agreed to make, but they compelled him to pay the

$4000.00 in advance of his taking possession of the plantation, instead of waiting until the crop should be sold as provided in the contract.

Krause never really had the exclusive ownership or management of the plantation in 1884. Dodd, Brown & Co. were always there through their agent, Vincent, who was working in their interest. The advances made nearly all enured to the benefit of the place in repairs, new buildings, new stock, new machinery and general improvements, and the place went back into the hands of Dodd, Brown & Co. Page was sent down twice during the year 1884. He was there during all the month of June and a part of July, and again from the 20th of December to about the middle of January, 1885. Dodd was there in November and as late as December, 1884. Krause was allowed to be alone but a small part of the time. Page figured on the accounts with Vincent, and Dodd arranged to get all the sugar and molasses shipped to his firm at St. Louis. The plantation was actually taken out of the hands of Krause in December, 1884, more than three months before the first note was due and before any default was made in the contract, and was afterwards turned over to one Juliffe, a representative of Dodd, Brown & Co.

By the contract Krause was to pay on April 1, 1885, $5000.00 on the first note and $3900.00 of interest on $65,-000.00, and all the advances made by Dodd, Brown & Co. during 1884 and interest on the same. He was also to pay all the taxes on the Chicago property and the Texas place and all the interest on the $14,000.00 incumbrance upon the Chicago property. How was he to make these payments except from what should be yielded by the plantation itself? Dodd admits having stated to Krause that Dodd, Brown & Co. had made a profit of $10,000.00 out of the place during one year. Krause not only did not make enough out of the crop raised in 1884 to meet his obligations of that year, but it was made to appear that he was in debt to Dodd, Brown & Co. at the

end of the year in the sum of $5846.71 over and above the $4000.00 paid by him, and over and above the proceeds of the sale of the crop. We are satisfied that he was overreached and defrauded by Dodd, Brown & Co. in the joint management of the place as above set forth, and that he would never have signed the contract and the trust deeds, if he had not been made to believe that Dodd, Brown & Co. would unite with him, and, by making all necessary advances, help him to pay what he agreed to pay.

Mr. Dodd went to the plantation on or about the 9th of December, 1884. The employees upon the place were then making sugar. He told Krause that his firm was unable to make any further advances. He produced a previously prepared bill of sale to be signed by Krause, selling all the crop, then made or to be made, to Dodd, Brown & Co. He stated that by pledging this bill of sale he would be able to raise money. Krause signed the bill of sale. If the signing of this bill of sale was not part of an agreement for rescission as Krause claims, then it was a gross breach of good faith on the part of Dodd to refuse to make the advances he had agreed to make, and to appropriate the whole crop before its sale. We find no copy of any account in the record and have no means of knowing what the proceeds of the sale of the crop were.

It is said that Krause visited the plantation in August, 1883, and therefore must be held to have bought it upon his own judgment and not upon the representations of Dodd, Brown & Co.

In the first place, the Jefferson Street property and the Congress Street houses belonged to Mrs. Krause and not to Mr. Krause. The $4000.00 paid to Dodd, Brown & Co. was the money of Mrs. Krause. The deed of the Texas plantation should have been made to her and not to her husband, as the consideration for that deed was paid with her funds and her land. Her ownership was known to Dodd, Brown & Co., because it is expressly referred to and recognized in the con-

13—132 ILL.

tract and trust deeds drawn by themselves. Mrs. Krause never saw the plantation until after the contract and trust deeds were executed. Whatever examination her husband made of it in August, 1883, could not bind her. He was not her agent. She refused to carry out the contract he made on October 17, 1883, and only consented to sell her houses and sign the trust deeds after Brown had talked to her. She was guilty of no *laches* in not repudiating the trade after she went to China Grove, because she sickened and died before she had time to thoroughly understand the true character of her surroundings. The children and heirs of Mrs. Krause are complainants in the present cross-bill.

In the second place, the examination made by Krause in August, 1883, was of the most meagre kind. He merely stopped over for a short time on his way to Columbia. Vincent says that he wanted to see cane growing, and did not speak as though he intended to buy. Krause arrived at the plantation with his sealed letter to Vincent late in the afternoon on Wednesday, and remained in the house the balance of the day. On Thursday he remained in-doors until late in the afternoon, because it was exceedingly hot, and he was told by Vincent that it was dangerous to venture out until the heat had abated. Vincent says, that they waited until the cool of the day, because he himself was sick. Late Thursday afternoon Krause and Vincent rode around the place. The cane and corn were high. They did not go to the woodland. Their examination was superficial. The sugar house was not in operation, but was closed and its machinery was idle. The stock was grazing at a distance. Krause left Friday morning. A number of witnesses testify, that it would take four or five days to make a satisfactory examination of a plantation so large as this merely for the purpose of ascertaining its outward and visible condition.

But it is very clear that Krause, stranger as he was and without knowledge of the sugar business, could not ascertain

the value and producing capacity of the place from his cursory inspection of it in August, 1883.

Nor can it be claimed that he was guilty of *laches* in not sooner repudiating his bargain. His letters to Dodd, Brown and Page show his dissatisfaction with the place and with Vincent's management and grasping propensities. But Dodd, Brown & Co. had him so completely in their power, that he was forced to await the outcome of the crop of 1884 before he could tell how he stood. From that crop alone he was to get the means of meeting his obligations if he met them at all. He was dependent upon them for the advances necessary to raise and ship the crop, and he knew that he would be obliged to rely upon them to put the crop upon the market and make sale of it. He says that he was afraid to offend Dodd, and his expressions and his conduct so declare. He could not know the full extent of their misrepresentations until the crop was raised. Before that time he could not make such full discovery of the fraud practiced upon him as would devolve upon him the duty of repudiating the contract.

Thus far we have considered the case solely with reference to the right of relief as based upon the falsity of the representations made by Dodd, Brown & Co. But aside from all this, Krause and his son both swear, that, in December, 1884, Dodd, when he was in Texas, agreed to a rescission of the contract. Many circumstances establish the truth of this testimony.

As before stated Dodd came to the place early in December. He then agreed that he would rescind the contract, pay back to Krause the $4000.00, and cancel the notes and trust deed upon the Chicago property, provided Krause would give up the plantation, give a bill of sale of all the crop, and remain upon the place long enough to assist in finishing the crop and forwarding it to St. Louis. This agreement was concurred in, and Dodd was to send Page down to take possession and carry out the contract of rescission. The bill of sale was executed

and the title to the crop placed in Dodd, Brown & Co. Krause remained and aided in the shipments, shipping 32 barrels on January 1, 1885, 72 barrels on January 6, 1885, 40 barrels on January 15, 1885, etc. Page came down about December 20 and was there until January 15. Everything was turned over to Page in December, the Krauses acting under his directions, and about February 1 Page placed the plantation under the control of Juliffe, as heretofore stated. But Page denied that he had any authority to carry out the contract of rescission, and brought with him no notes or trust-deed or release papers.

It was not until the middle of January that the Krauses, father and son, discovered that Dodd, Brown & Co. had no intention of carrying out the contract of rescission. Page and the elder Krause suddenly left the place, the former for a neighboring town, the latter for St. Louis. Young Krause says: "Things were then very uncomfortable and Mr. Page got out about as quick as he knew how. He went to Sandy Point and spent several days there. We then saw that things were not as Mr. Dodd said he was going to do. * * * Father went that same night that Page left the house."

If there was no agreement for rescission, why was the crop given to Dodd, Brown & Co., and the plantation turned over to them, three months before Krause could be charged with any default on his contract or notes? Why did Krause leave and go so suddenly to St. Louis? He was there from the middle of January to the latter part of April. He says he went to demand his money, the $4000.00, and a cancellation of the notes and a release of the trust deed. He obtained no satisfaction and returned to the plantation about the first of May, and shortly afterwards left for the North with his family, carrying away nothing but his household furniture. While he was gone, his saw-mill was attached in a suit for $300.00 upon a note he had given for mules for the place, and which Dodd had promised to take care of. The Sheriff sold the saw-mill,

and it was bid in by Juliffe for Dodd, Brown & Co. Of his stay in St. Louis he says: "I was kept there by James Brown from one day to another until after April. * * * He promised all the time he would make a settlement with me, deferred me from one day to another, * * * told me to come tomorrow, or day after tomorrow, or three or four days. I was in there every day. I went back to the plantation when I found I could not get anything out of him." Dodd claims that he retired from the firm in January, 1885, and was away from St. Louis in March, and went to Europe in April. Brown claims that he bought out the interest of Dodd in the firm, and is sole owner of the notes.

If a court of equity were powerless to relieve these children against the refined and heartless deception which was practiced upon their mother and their too confiding father, then it would be better that courts of equity should close their doors and try no longer to administer justice.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*